**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **VERNARD JAY BROWN, Jr.,** | § | |
| **TDCJ No. 02040544** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **A-19-CV-223-LY** |
| | § | |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates Judges.

Before the Court are *pro se* Petitioner Vernard Brown, Jr.'s Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1), Respondent Davis's Response (ECF No. 16), and Petitioner's Reply (ECF No. 18). Petitioner has also filed a Motion for Evidentiary Hearing, appointment of counsel, bench warrant, loan of appellate record, and issuance of subpoenas. (ECF No. 19.) Having reviewed the record and pleadings submitted by both parties, the undersigned concludes Petitioner's federal habeas corpus petition should not be granted under the standards

prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d). The undersigned also recommends the Court deny Petitioner's pending motion and deny a certificate of appealability.

## I. Background

In September 2015, Petitioner was charged by indictment with one count of continuous sexual abuse of a young child, five counts of aggravated sexual assault of a child, and four counts of indecency with a child by contact. (ECF No. 17-22 at 4-8.) In December 2015, Petitioner was found guilty of continuous sexual abuse of a young child and sentenced to ninety-nine years in prison. *State v. Brown*, No. D-1-DC-15-904067 (167th Dist. Ct., Travis Cnty., Tex. Dec. 11, 2015) (ECF No. 17-22 at 61.) Below is a summary of the factual background for Petitioner's conviction.

Brown is the biological father of the victim in this case, C.H. Prior to C.H. turning eleven years old, C.H. had never met Brown. According to the testimony from trial, after C.H. had lived with her aunt for some time, Brown contacted C.H., started visiting her, and obtained legal custody over C.H. Once Brown obtained custody of C.H., C.H. moved into the home of Brown's mother, Ernestine Haney, in July 2011 when C.H. was twelve years old. There was some dispute at trial regarding whether Brown was living in the home with C.H. and Haney. According to C.H. and Felicia Smith, who was a woman that Brown became romantically involved with after C.H. moved into Haney's home, Brown was living full time at Haney's home during the relevant time frame. According to Haney, Brown did not live at her home permanently and was "seldom there," but Haney explained that he would spend the night at the house sometimes. After Brown started dating Smith, he moved in with Smith and her son, T.S., in October 2011. According to Haney and Smith, C.H. moved in with Smith in November or December of 2011. During the trial, testimony was introduced establishing that after C.H. moved into Smith's home, T.S. and C.H. began a sexual relationship that resulted in C.H. becoming pregnant.

Regarding the months that she lived at Haney's home, C.H. testified that "shortly after" she moved in, Brown began touching her in inappropriate ways. First, she explained that while they were watching television in the living room, he touched her stomach in a way that made her feel weird and that on another day, he "touched [her] butt" over her clothes in the kitchen. In addition, C.H. related that this type of behavior escalated. In particular, C.H. explained that when she was

watching television in her bedroom, Brown "went in [her] night pants" and touched her "private part" with his hand over her underwear. Then, C.H. stated that the next inappropriate act also occurred in her bedroom while she and Brown were watching television and explained that Brown touched her "private part" again but went in her underwear this time. In addition, C.H. related that nothing else happened that time and that Haney walked into the bedroom and told Brown to leave because it was not appropriate for him to be in C.H.'s room with the door closed and because C.H. "was too big for him to just be in [her] room like that." Further, C.H. revealed that the next act of abuse also occurred in her bedroom. Specifically, she stated that Brown got under the covers in her bed, told her that he was going to show her "how to please . . . [her] man," took both of their pants off, and "started having sex with" her by inserting his penis into her vagina. When describing the assault, she said that it hurt, that she told Brown that it hurt, and that Brown told her that the pain would go away. In her testimony, C.H. explained that Haney walked into the room like she had the time before, asked what the noise was, and told Brown that "he shouldn't be in [C.H.'s] room."

Later in her testimony, C.H. related that after Haney caught him in C.H.'s bedroom for the second time, Brown never initiated any sexual activity in C.H.'s bedroom again and would instead take C.H. to his bedroom at Haney's house when everyone else was sleeping. Regarding the first incident in Brown's room, C.H. stated that they had sexual intercourse and that Brown "tried to put his penis in [her] butt" but that he stopped after she told him that it hurt. Next, C.H. testified that on another evening Brown took her to his bedroom and that they had sexual intercourse. In discussing yet another incident, C.H. related that Brown asked her to "play with" his penis by placing her hand on it and moving her hand "[u]p and down," that this action caused Brown's penis to become erect, and that she felt something wet come out of his penis. Further, she testified that on one occasion, Brown touched her breast with his penis and that on another occasion, he put his fingers in her vagina. In her testimony, C.H. explained that they had vaginal intercourse "a lot." In fact, she stated that they had sex "[m]ore than 10 times" during the time that she lived at Haney's home. Regarding the last time that the conduct occurred, C.H. testified that they had vaginal intercourse right "[b]efore he went to go live with" Smith. When Brown's trial attorney, Joe Sawyer, cross-examined C.H., he asked C.H. about her relationship with T.S., about whether she had initially claimed that Brown had forced T.S. and C.H. to have sex, and about whether that initial claim was true. Moreover, Sawyer asked C.H. about other claims that she had made against Brown.

During her testimony, Haney explained that when she walked into C.H.'s bedroom, she saw C.H. and Brown watching television and stated that they both had clothes on. Further, Haney related that she only went into the room after hearing the television and told them that it was too late to still be watching television. In addition, she denied hearing any moaning or any similar noises and stated that she

never believed that anything inappropriate happened between Brown and C.H. Haney did admit that there were times when Brown was alone with C.H. at the house and that she asked C.H. if Brown had tried to sleep with her. In addition, Haney testified that some time after C.H. moved out, C.H. told Haney that Brown had engaged in inappropriate sexual activity with her at Haney's home, and Haney related that she offered to call the police but that C.H. told her not to and then recanted the allegation. Further, Haney characterized C.H. as "a compulsive liar." During his cross-examination of Haney, Sawyer did not question Haney about the allegations.

Following Haney's testimony, a recording of a phone call between Haney and Brown made while he was in jail was admitted into evidence and played for the jury. On the recording, Haney stated that she went into the room because she heard "moaning and groaning," recalled that Brown jumped up when she entered the room and acted weird, stated that she had no idea "what the hell was going on between" Brown and C.H. when he was in her room at 3:00 a.m. after everyone had gone to sleep, mentioned that there were times when Brown and C.H. were alone at the house, and questioned generally whether something inappropriate had occurred.

According to the testimony presented at trial, sometime after Brown and C.H. moved in with Smith, Brown and Smith ended their romantic relationship, but C.H. continued to live with Smith and considered Smith to be a mother figure. Several months after the breakup, Brown told Smith and C.H. that he wanted C.H. to come live with him and his new girlfriend. According to Smith's testimony, C.H. stated that she did not want to live with Brown and told Smith that she and Brown had a sexual relationship in the past and that they had engaged in oral, vaginal, and anal sex. In addition, Smith related that C.H. told her that Brown would rub his penis on her vagina. Moreover, Smith testified that C.H.'s description of the order and manner in which Brown performed the various sexual acts and of the topics that Brown discussed during those acts was consistent with Smith's own sexual experiences with Brown. In addition, Smith recalled that C.H. told her that the sexual behavior occurred while C.H. was living at Haney's house with Brown.

In addition to Smith, Haney, and C.H. being called to the stand, the State also called Dr. William Lee to provide expert testimony regarding victims and perpetrators of sexual abuse. During his testimony, Dr. Lee mentioned, among other things, that "[t]he generally accepted statistic is about six to eight percent of the time when a sexual abuse allegation is made the child is just flat-out lying," and Sawyer later cross-examined Dr. Lee regarding that statistic.

At the conclusion of the guilt-or-innocence phase of the trial, the jury determined that Brown was guilty of the offense of continuous sexual abuse.

During the short punishment phase, the State called the following three witnesses to the stand: Smith, T.S., and Amisca Mallard. In her testimony, Smith discussed the impact that the abuse has had on C.H. During his testimony, T.S. mentioned that after Brown moved in with Smith, Brown encouraged T.S. to take drugs and to fight. In addition, T.S. related that he caught Brown having sex with women other than Smith and that on one of those occasions, Brown asked T.S. if he wanted to join them. Finally, the State called Mallard to the stand, and she testified that she knew Brown when they were in high school. In addition, she explained that one day while they were at school, he started touching her in an inappropriate manner, that he dragged her behind a trash can, that he raped her behind the trash can, and that she tried but was unable to fight him off. During the punishment phase, Sawyer did not cross-examine any of the witnesses.

At the conclusion of the punishment phase, the jury assessed Brown's punishment, and the district court rendered its judgment of conviction. Following the district court rendering its judgment, Brown filed a motion for new trial asserting that he "received ineffective assistance of counsel." The district court convened a hearing on the motion in which Brown called several witnesses to testify on behalf of Brown, and the district court later denied the motion but did not issue any findings of fact or conclusions of law.

*Brown v. State*, No. 03-16-00011-CR, 2017 WL 876029, at *1-3 (Tex. App.--Austin Feb. 28. 2017, pet. ref'd).

On February 28, 2017, Petitioner's direct appeal was affirmed by the Third Court of Appeals of Texas. *Id*. On June 2, 2017, the Texas Court of Criminal Appeals (TCCA) refused Petitioner's petition for discretionary review (PDR). *Brown v. State*, No. PD-0266-17 (Tex. Crim. App. June 2, 2017). Petitioner did not file a writ of certiorari in the United States Supreme Court. (ECF No. 1 at 3.)

On October 22, 2018, Petitioner filed his state habeas corpus application. Petitioner's complete application listed the following sixteen grounds for relief:

1. Trial counsel provided ineffective assistance when counsel failed to investigate the crime scene, i.e. Petitioner's mother's home;
2. Trial counsel provided ineffective assistance when counsel failed to investigate documents relating to Petitioner's residence;

3.   Trial counsel provided ineffective assistance when counsel failed to investigate favorable witnesses;

4.   Trial counsel provided ineffective assistance when counsel failed to investigate the state's witnesses prior to trial;

5.   Trial counsel provided ineffective assistance when counsel failed to investigate prior to trial;

6.   Trial counsel provided ineffective assistance when counsel failed to cross-examine and impeach state's witnesses at trial;

7.   Trial counsel provided ineffective assistance when counsel failed to cross examine and rehabilitate Petitioner's favorable witness;

8.   Trial counsel provided ineffective assistance when counsel failed to offer evidence and pursue agreed-upon defense;

9.   Petitioner was constructively denied counsel for his Texas Code of Criminal Procedure Art. 38.072 hearing;

10.   Petitioner was constructively denied counsel at his sentencing, when his trial counsel failed to investigate or challenge the state's evidence and witnesses;

11.   Petitioner was constructively and actually denied counsel in the preparation of his motion for a new trial and at that the hearing;

12.   The prosecutor engaged in misconduct by using false and misleading testimony and by making improper closing arguments;

13.   Appellate counsel provided ineffective assistance when counsel failed to investigate;

14.   Appellate counsel provided ineffective assistance when counsel failed to raise meritorious issues on appeal and had a conflict of interest;

15.   The trial court abused its discretion and plainly erred when it denied Petitioner's motion for a new trial, and the Court of Appeals plainly erred by deciding his case based on an incomplete record; and

16.   The evidence used to convict Petitioner is legally insufficient. (ECF No. 17-44 at 5-44.)

On November 16, 2018, the state filed its original answer to Petitioner's state writ application.

(ECF No. 17-44 at 107-13.) On November 29, Petitioner filed a motion to file supplemental

grounds to his original writ application, and included the following three grounds:

17.   Trial counsel provided ineffective assistance when he misled Petitioner about allocution and failed to advise Petitioner about his motion for a new trial;

18.   Petitioner received ineffective assistance of trial counsel based on counsel's cumulative errors; and

19.   The trial court and Court of Appeals plainly erred by applying the wrong legal standard in deciding his motion for a new trial.

(*Id.* at 96-106.) The Clerk of Court transmitted Petitioner's state writ application—including his

motion to file supplemental grounds—on December 4, 2018 (*id.* at 164), and on January 16, 2019,

the TCCA denied Petitioner's state habeas corpus application without written order, *Ex parte Brown*, No. WR-89,263-01. (ECF No. 17-41 at 1.)

Petitioner filed the instant federal habeas petition on February 29, 2019. (ECF No. 1.) In it, he raises the same claims that were raised and rejected in his state writ application and the motion to supplement. On August 15, 2019, Respondent filed an answer to Petitioner's federal habeas petition, to which Petitioner replied on September 11, 2019. (ECF Nos. 16, 18.) On November 25, 2019, Petitioner filed a Motion for Evidentiary Hearing, Appointment of Counsel, Bench Warrant, Loan of Appellate Record, and Issuance of Subpoenas. (ECF No. 19.)[1]

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a

---

[1] Respondent argues that several of Petitioner's claims are unexhausted and procedurally barred. However, after reviewing Petitioner's petition and the state habeas record, the Court concludes that claims 17-19 were included in Petitioner's state habeas application in the motion to file supplemental grounds he filed on November 29, 2018. (ECF No. 17-44 at 96-106.) Further, the Court also concludes that Petitioner has presented the substance of claims 11 and 14 to the state habeas court, and thus these claims are exhausted for purposes of federal review. *See* 28 U.S.C. § 2254(b)(1)(A) (federal court may not grant habeas relief unless the petitioner "has exhausted the remedies available in the courts of the State"); *Picard v. Conner*, 404 U.S. 270, 275 (1971) (grounds raised in a federal habeas petition must have been "fairly presented" to the state courts prior to presentation in federal courts; in order for a claim to be exhausted, the state courts must have been presented with the same facts and legal theory upon which the petitioner bases his federal claims).

complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

### III. Analysis

#### A.  Ineffective Assistance of Trial Counsel (IATC) (claims 1-4, 6-9, 17-18)

Petitioner raises several overlapping IATC claims in his federal petition, each one having been raised and rejected during Petitioner's state habeas proceedings. Specifically, Petitioner contends trial counsel failed to: (1) investigate the crime scene, i.e. his mother's, Ernestine Haney's, home prior to trial; (2) investigate and obtain documents relating to Petitioner's actual

residence; (3) investigate, interview, and subpoena witnesses; (4) interview State witnesses prior to trial; (5) cross-examine and impeach the State's witnesses; (6) rehabilitate Petitioner's only favorable witness (Ernestine Haney); (7) investigate prior to trial; (8) offer evidence and provide a defense; (9) misled Petitioner about allocution and provided no advice regarding the motion for a new trial; and (10) provide effective assistance of counsel based on cumulative errors. As discussed below, Petitioner fails to demonstrate the state court's rejection of these challenges was contrary to, or an unreasonable application of, Supreme Court precedent.

### 1. The Strickland Standard

Sixth Amendment claims concerning the alleged ineffective assistance of trial counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 22 (2013) (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the

"likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

IATC claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the IATC claims on the merits, a federal court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *See Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101. Consequently, the question is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

### 2. Failure to Investigate and Call Witnesses (claims 1-4, 8-9)

Petitioner argues that trial counsel provided ineffective assistance when he failed to (1) investigate his mother's home for impeachment evidence; (2) obtain government documents showing that Petitioner did not live with Ms. Haney during the timeline of the sexual assaults; (3) find, subpoena, and interview witnesses; and (4) fully investigate the case before trial and during trial in order to understand the facts and construct an effective defense.

*Strickland* requires counsel to undertake a reasonable investigation. 466 U.S. at 690-91; *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). Counsel must, at minimum, interview

potential witnesses and make an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). In assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed in light of the defendant's own statements and actions. *Strickland*, 466 U.S. at 691. To prevail on an IATC claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Furthermore, a petitioner cannot "simply allege but must affirmatively prove prejudice" under *Strickland* when complaining of counsel's failure to investigate. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). A petitioner alleging that an investigation is deficient must show what the investigation would have uncovered and how the petitioner's defense would have benefited from this information. *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986).

In his federal petition, Petitioner's claims based on counsel's failure to investigate (claims 1-4) do not specify what, exactly, trial counsel should have uncovered. Looking at those same claims in Petitioner's state writ, Petitioner argues that, upon searching his mother's home, counsel would have learned that, contrary to the complainant's outcry, there was no way to watch television in the complainant's room and that the house was solidly constructed such that Ms. Haney would never have been able to hear noises—short of screaming—coming from the complainant's room. Petitioner also argued that counsel failed to obtain government documents, like his government benefit application forms and his driver's license, which would have shown he was not living at Ms. Haney's house during the time period in question, and did not have regular access to the

complainant. Petitioner also argued that counsel failed to locate and subpoena several witnesses, including Linda Curcio, Ebonee Chagois, Angela McRae, and Brenda McDonald Dickerson, who would have testified that Petitioner was not living in Ms. Haney's home in 2011; that the complainant had a "character for falsehood"; and that he and the complainant had a good bond, and he was a good father.

Petitioner further argues in his federal petition that trial counsel failed to discuss the state's witnesses with Petitioner, and that, if counsel had done so, he could have impeached Felicia Smith with evidence that Petitioner was the complainant's sole conservator—and, as such, had no custody battle with Ms. Smith—and would have uncovered evidence of Ms. Smith's "violent nature" and fraudulent tax filings, thus suggesting she was financially motivated to fabricate the complainant's outcry. (ECF No. 17-44 at 10-17.) In claims 8-9, Petitioner essentially restates these allegations, but transfers them from the pretrial to trial context, and adds that counsel failed to contact the complainant's guardian ad litem and failed to offer any evidence that Petitioner lacked opportunity to commit the offense, his only viable defense. (ECF No. 1 at 13.)

Petitioner advanced many of these same claims in his December 2015 motion for a new trial based on ineffective assistance of counsel. (ECF No. 17-22 at 96-114.) At the February 2016 MNT hearing, four witnesses testified: Willie Flavia, Petitioner's court-appointed investigator; Ebonee Chagois; Joe James Sawyer, Petitioner's trial counsel; and the Petitioner.

Mr. Favila testified that Mr. Sawyer asked him to locate three witnesses: Ebonee Chagois, Tatronya Matthews, and Shonday Love. Mr. Favila only succeeded in contacting Ms. Chagois, whom he spoke with on the phone in November 2015, one month prior to Petitioner's trial. He testified that the conversation lasted less than sixty seconds, that she sounded evasive, and that he

felt as though she did not want to help Petitioner. Favila also testified that Ms. Chagois told him she and Petitioner had "stayed together" and suggested that the complainant was a liar. Mr. Favila was not successful in locating Ms. Chagois in person. Mr. Favila also testified that he spoke with Petitioner in person in October and December 2015, and that he let Petitioner know that Ms. Chagois was not cooperative. Mr. Favila also stated he contacted Linda Cucio, the guardian ad litem, who told him she was not allowed to speak with him due to confidentiality. (ECF No. 17-36 at 13-29.)

Mr. Sawyer, Petitioner's trial attorney, testified that, regarding the defense Petitioner wanted to pursue: "basically [his] defensive theory, and the one I adopted as well, was that he couldn't have been present to perform the acts of misconduct of which he stood accused." (ECF No. 17-36 at 35.) Regarding the pretrial investigation, Sawyer testified "[t]here is no question that the names of the three women that Mr. Brown had given us I thought were absolutely important to establishing his defense." He further noted that he was impressed by how thorough Favila had been with his investigation, that he took two continuances in order to find the witnesses Petitioner listed, and that he and Mr. Favila had done "everything we could think of to locate these witnesses." (*Id.* at 52-53.)

Ms. Chagois testified at the hearing that she had received a phone call, but denied having said anything that would have given Mr. Favila the impression she did not want to be involved in the case or would have been a bad witness. She also testified that she would have appeared in court to testify, if she had been subpoenaed. (*Id.* at 81-82.) Regarding Ms. Curcio, the complainant's previous guardian ad litem, Sawyer testified he did not call her because he "felt there was nothing

there." (*Id.* at 57.) Neither Mr. Favila nor Mr. Sawyer had any knowledge of Brenda McDonald

Dickerson or Angela McRae.

When asked whether he had obtained Petitioner's driver's license, which listed a different

address than Petitioner's mother's house, Sawyer testified:

> I understand how one can think it's somewhat dispositive, but we had live
> testimony about where [Petitioner] was living and when he was at [his mother's]
> house. And I think lawyers have to elect what evidence they're actually going to
> offer a jury, how persuasive it is, how it fits into the defensive scheme or theory.
> And I had many conversations with Mr. Brown about what he thought was the
> appropriate way to try the case. He spent an awful lot of time reading the law and
> making himself familiar with case law. But I think in the end the manner in which
> proof is presented is something a trial lawyer has to decide. . . . I think his theory
> was sound. I think that some of his ideas about how to go about it were simply—
> wouldn't have been fruitful at trial. So, yeah, I think a trial lawyer is charged with
> the responsibility of deciding the best way to present evidence to a jury in order to
> obtain a not guilty. Sometimes the evidence is superfluous. Sometimes it's not in
> any way really going to be dispositive to a jury. (*Id.* at 40-41.)

Further, when asked about the residence timeline Petitioner had created, Sawyer testified:

> Sawyer: The problem I saw was that it was other witnesses' testimony that we were
> going to have to counter, and the timeline would have worked except for the fact
> that, I believe, it was an act of futility in the face of the evidence I knew that we
> were going to be offered at trial.
>
> Q. And what was that evidence?
>
> Sawyer. That he had more than one occasion to have engaged in a conduct alleged
> and I think that those witnesses made it clear that those opportunities were there.

For example, when Ernestine Haney was asked at trial "were there times where he was alone with

[the complainant]?", she responded "Yes, I'm sure." (ECF No. 17-32 at 159.)

Regarding the complainant's alleged "compulsive lying," Sawyer described his trial

strategy as follows:

> Sawyer: I think one of the things that did happen in the trial, we discussed it and
> I—in fact, it was in response to the State's question in front of a jury that she

14

admitted that she had lied. I remember specifically the State asked why did you lie, and her response was, tearfully, I don't know. So I felt that this was presented to the jury. I felt there was an admission from her that she had lied. Now, the State never tried to sidestep that and took it straight on with the jury. So the jury knew that she had lied.

Q: And what specifically had she lied about? Because, obviously, I wasn't at trial. I don't know what the specifics of it were.

Sawyer: If I recall, and I think I do, there were these two or three instances of her having lied. In fact, having lied not too long before trial began about having been sexually assaulted by someone else. Again, I thought we covered that ground fairly well. I thought that point was made to the jury. (ECF No. 17-36 at 42-43.)

More specifically, during the trial Sawyer impeached the complainant with her prior statement that Petitioner had made her engage in sexual intercourse with another minor so that he could watch. It was during Sawyer's cross-examination that she admitted the story was a lie. (*Id.* at 54-55.)

Accordingly, the Court concludes that Petitioner has not rebutted, with clear and convincing evidence, the state habeas court's implied factual finding that counsel's investigation was adequate. Petitioner gave counsel several witnesses to contact, but Favila and Sawyer's investigation produced only the one telephone contact with Chagois, who left them with the impression she did not want to help Petitioner's case. Even if Ms. Chagois had testified at trial, her motion for a new trial testimony that Petitioner had lived with her from June to October 2011 and that the complainant had a propensity for lying, was cumulative of the evidence introduced at trial. *See Trottie v. Stephens*, 720 F.3d 231, 246-47 (5th Cir. 2013) (finding IATC claim for failing to call a witness fails if the proposed testimony was cumulative of evidence already in the record); *Skinner v. Quarterman*, 528 F.3d 336, 345 n. 11 (5th Cir. 2008) (same).

Petitioner's IATC claims rely heavily on his theory that trial counsel failed to understand and investigate sufficiently his lack-of-opportunity defense. The record does not bear this out. Mr.

Sawyer testified that he pursued the lack-of-opportunity defense to the best of his ability. The prosecution, however, also supplied evidence showing that, regardless of where he lived, Petitioner had access to the complainant on more than one occasion. Petitioner has not alleged with any specificity what further investigation would have revealed or how it would have altered the outcome of the trial. *See Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011). Petitioner also has not pointed to exculpatory evidence that trial counsel could have uncovered with additional investigation or proven that an undiscovered witness would have testified in his favor. *See Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). As a result, Petitioner has not shown counsel's performance was deficient or that the state court's denial of this claim was an unreasonable application of *Strickland*.

### 3. Failure to Cross-Examine/Rehabilitate Witnesses and Offer Evidence (claims 6-7)

In claims 6-7, Petitioner argues that trial counsel was ineffective because he failed to adequately cross-examine Felicia Smith and failed to rehabilitate Ernestine Haney during the guilt/innocence portion of the trial. These claims echo Petitioner's claims from the prior section; namely that, had trial counsel done more investigative work, he could have cross-examined Ms. Smith with evidence of the duress and coercion she placed on the complainant and with her inconsistent statements. Further, if trial counsel had investigated Ms. Haney's home, he could have rehabilitated her on cross-examination, and thus saved her testimony as she was Petitioner's only favorable witness.

"[C]ounsel has wide latitude in deciding how best to represent a client . . ." *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer

neglect."). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Thus, counsel's choice of a defense and his strategy in arguing that defense to a jury are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

As noted above, counsel thoroughly investigated Petitioner's case and pursued Petitioner's chosen defense. There is no evidence in the record supporting Petitioner's allegations against Ms. Smith outside of his conclusory statements. *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007) ("[C]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel." (quoting *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000))). Further, Ms. Haney testified that Petitioner had access to the complainant, and between that testimony and the jailhouse call between her and Petitioner, there is no support in the record for how counsel could have rehabilitated her. Because counsel's decisions regarding cross-examination were strategic and eminently reasonable, they do not support an ineffective-assistance claim. *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (recognizing the broad deference to which counsel is entitled in making tactical decisions in closing argument). Petitioner has not shown counsel's performance was deficient, much less that the state court's denial of this claim was an unreasonable application of *Strickland*.

### 4. Failure to Provide Adequate Counsel During Motion for New Trial (claim 17)

In claim 17, Petitioner argues that counsel provided ineffective assistance at sentencing, that he misled Petitioner about testifying, and that he provided no assistance with Petitioner's motion for a new trial. Petitioner alleges he prepared a statement to read to the jury before

17

sentencing, but counsel told him he could not read it because he had waived his right to testify. Petitioner also argues that trial counsel withdrew five days after the trial ended and did not help Petitioner file his motion for a new trial.

There is nothing in the record to support Petitioner's allegations that he was prevented from speaking to the jury prior to sentencing. At the motion for a new trial, counsel asked Mr. Sawyer about Petitioner's interest in testifying at trial:

Sawyer: Pretrial, I think it's safe to say that Mr. Brown wanted to testify.

Q: And he did not testify at trial; is that correct?

Sawyer: That's correct.

Q: And what was the difference? What changed?
Sawyer: We had a conference during the trial. It involved Kristiana Butler, a lady who had no previous trial experience. She was simply sitting to see what a criminal trial was like. She assisted me as much as she could, did anything that I asked her to do during the trial. We met with Mr. Brown and discussed, again, what his testimony might accomplish in the trial. He then elected not to testify. I wanted to be absolutely sure that that was his wish, so I prepared a document, a copy reflecting the fact that he had met with us and that it was his decision to exercise his right pursuant to the Fifth Amendment and I had him sign it. And it was then that we carried on and he didn't testify.

Q: Okay. And the basis of his decision was the information that his lawyer—his trial lawyer gave him basically at that point?

Sawyer: Well, and his own observation of what had happened to that point in trial. And, again, Mr. Brown is a person who has made himself very familiar with the law and the rules. We talked about the utility of his testimony, in what way he could be impeached, whether it was worth the risk testifying, to have the robberies come in to impeach him. He had used a box cutter, as I recall, in the robberies. They would have been – the jury would have known that he was also charged with escape as well as the two robberies.
          In our meeting, we weighed that against the impact—the favorable impact that he might have with the jury versus any impeachment and the evidence that the jury had heard at that point in trial. We answered every question he had. We gave him the input. As I said, he had participated in the trial to that point himself and it was then that he elected not to testify. (ECF No. 17-36 at 47-48.)

The state proffered a copy of Petitioner's letter waiving his right to testify. (ECF No. 17-38 at 5.)

Again, Petitioner's allegations that trial counsel prevented him from speaking to the jury and failed to assist him in filing a motion for a new trial are conclusory, have no support in the record, and cannot be the basis for a cognizable habeas claim. *See Demik*, 489 F.3d at 646. Rather, the record shows that Sawyer and Petitioner discussed whether he should testify at trial, and Petitioner decided against testifying and signed the waiver letter. Accordingly, Petitioner cannot show that counsel's performance was deficient or that the state habeas court's denial of this claim was an unreasonable application of *Strickland*.

### 5. Cumulative Error (claim 18)

Petitioner's last IATC claim argues that trial counsel provided ineffective assistance based on the cumulative effect of all the errors previously discussed. However, as the Court has concluded that none of Petitioner's claims are meritorious, there can be no cumulative effect. *See Westley v. Johnson*, 83 F.3d 714 726 (5th Cir. 1995) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." (citing *Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir.1992))). Accordinly, under the deferential review encompassed by *Strickland* and the AEDPA, Petitioner's IATC claims should be denied. *Richter*, 562 U.S at 105.

### B. Constructive/Actual Denial of Counsel (claims 5, 10, 12)

Petitioner advances three claims based on the constructive or actual denial of counsel: (1) at the Article 38.072 outcry hearing (claim 5), Petitioner argues he was constructively denied counsel because counsel never discussed strategy with him, did not cross-examine any witnesses,

and did not demonstrate that the complainant's outcry was made under duress and coercion from Felicia Smith; (2) during sentencing (claim 10), Petitioner argues he was constructively denied counsel when counsel failed to rebut the state's witnesses, offer any evidence on Petitioner's behalf, or ask for mercy on behalf of Petitioner's mother who had recently lost her youngest child; and (3) before and during his motion for a new trial, because the trial court failed to appoint appellate counsel for two weeks after his trial counsel withdrew, thus resulting in his appellate counsel being completely unprepared at the motion for a new trial hearing (claim 12).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This means that "a defendant is entitled to be represented by counsel at all critical stages of a criminal proceeding against him." *Mempa v. Rhay*, 389 U.S. 128, 134 (1967); *Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963); *see also United States v. Taylor*, 933 F.2d 307, 312 (5th Cir.1991). In general, a defendant asserting a violation of his Sixth Amendment right to counsel is required to demonstrate *Strickland*'s two-pronged standard that counsel's performance was deficient and that he was prejudiced as a result. 466 U.S. at 692. However, in *United States v. Cronic*, the Supreme Court recognized three situations involving circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" and thus prejudice is presumed: (1) the "complete denial of counsel" during a critical stage of the proceedings; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where surrounding circumstances make it "unlikely that any lawyer could provide effective assistance." 466 U.S. 648, 658-59 (1984); *Bell v. Cone*, 535 U.S. 685, 694-96 (2002).

20

Petitioner argues that he was constructively denied counsel at his Article 37.082 hearing because trial counsel failed to cross-examine witnesses and show that the complainant's outcry was made under coercion and duress. Texas Code of Criminal Procedure Article 38.072 provides that, for certain criminal offenses committed against a child younger than 14 or a person with a disability, a statement is not inadmissible hearsay if, inter alia, "the trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(2) (West 2019). The outcry hearing was held prior to the start of the criminal trial. (ECF No. 17-32 at 8-32.) The State called two outcry witnesses—Felicia Smith and Amy Howard, a forensic interviewer at Child Abuse Network—as well as the complainant. Mr. Sawyer did not cross-examine either of the witnesses or the complainant. Sawyer did make a closing argument where he argued that only Felicia Smith should be permitted to make hearsay statements pursuant to Article 38.072. The Court agreed and Ms. Howard was excluded as an outcry witness. (*Id.* at 32.) Although Petitioner apparently wanted his counsel to cross-examine Felicia Smith and the complainant, the Article 38.072 hearing was not about witness credibility, but about who could make hearsay statements during trial. Further, counsel succeeded in excluding one of the state's outcry witnesses. Consequently, the state court's decision to deny this claim was not an unreasonable application of clearly established federal law or an unreasonable application of the facts in light of the evidence presented.

In claim 10, Petitioner argues he was constructively denied counsel at sentencing when Sawyer failed to conduct an investigation, present evidence, or subject the State's case to adversarial testing. Specifically, Petitioner argues Sawyer could have impeached the testimony of

sentencing witnesses Terrance Smith and Amisca Mallard, and asked for mercy on behalf of Petitioner's mother, Ernestine Haney, who had recently lost her youngest child. Petitioner does not say in his federal habeas application what impeachment evidence he believed Sawyer should have used, but in his state habeas application Petitioner argues that another uncalled witness—Donna Allen—would have testified that Terrance regularly beat up on the complainant, and that Amisca Mallard could have been impeached by showing how she had been "delusional obsessed" with Petitioner since high school. (ECF No. 17-44 at 79-80.)

At the new trial hearing, Sawyer was asked about his preparations for the punishment phase and responded "[t]here was very little to prepare for because he knew what was going to commence. State had given me discovery. And as you know, the bad act allows virtually anything to come in. And, again, there was just no surprise and no question about what was going on." (ECF No. 17-36 at 49-50.) Sawyer also testified that, during sentencing, he believed "any attempt at mitigation would have only exacerbated [Petitioner's] problem with that jury" and that he spoke with Petitioner about "the certainty that if we proceeded to punishment, that I thought it would be extreme." Finally, of Amisca Mallard's testimony, Sawyer testified he warned Petitioner "that if that previous rape complainant were testifying . . . that that would probably be the end of the line" and that her testimony "was a very quiet dramatic testimony, and I felt that anything offered by the defense in light of that could only further inflame the jury." (*Id.* at 50-51.)

In arguing he was constructively denied counsel at sentencing, Petitioner is effectively arguing that Sawyer failed to test the prosecutor's case. However, the Supreme Court has held that this failure "must be complete." *Bell*, 535 U.S. at 697. Although Sawyer did not offer evidence or cross-examine the State's witnesses during sentencing, his testimony makes clear that this was an

22

intentional strategy and that he believed cross-examining witnesses, or calling Ms. Haney, would have only served to inflame the jury. Petitioner nonetheless received the maximum sentence even with this strategy in place; he now likely wishes Mr. Sawyer had adopted a different strategy. However, as the Supreme Court explained, "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110. For this reason, every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689; *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted).

Further, in the state sentencing context, *Strickland* requires a showing that "absent counsel's errors, there is a reasonable probability that the defendant's sentence would have been significantly less harsh." *Dale v. Quarterman*, 553 F.3d 876, 880 (5th Cir. 2008). Here, the record shows that Sawyer's decision not to cross-examine witnesses or offer evidence at sentencing was an intentional strategy and not the complete denial of counsel envisioned in *Cronic*. Further, Petitioner has made no showing that adopting a different strategy would have resulted in a significantly less harsh sentence. Indeed, counsel's pretrial advice to Petitioner that if he were found guilty and the case proceeded to sentencing, the sentence would be "extreme" was a very reasonable prediction in light of the accusations and evidence against Petitioner.   It is difficult to imagine what any reasonable attorney could have to done to mitigate the punishment in these circumstances. Accordingly, the state habeas court decision to deny this claim was not objectively unreasonable.

Finally, in claim 12, Petitioner argues that he was actually denied counsel during the two-week period after his trial counsel withdrew and appellate counsel was appointed. He argues this actual denial of counsel resulted in the constructive denial of counsel at his new trial hearing, because appellate counsel was unfamiliar with the case and unable to truly represent him.

Petitioner was found guilty on December 10, 2015, sentenced on December 11, and Mr. Sawyer withdrew as Petitioner's counsel on December 16, 2016. (ECF No. 17-22 at 66.) Ariel Payan was appointed as appellate counsel on December 30, 2015 but did not receive notice of this appointment until January 4, 2016. (ECF No. 17-36 at 6.) Petitioner mailed his pro se motion for a new trial on December 29, 2015, which was filed on January 7, 2016. (ECF No. 17-22 at 73-85) At that point, Mr. Payan had already filed a "pro forma" motion for a new trial. (ECF Nos. 17-22 at 89; 17-36 at 6.) After speaking with the prosecutor, Mr. Sawyer, and then Petitioner on January 10, Mr. Payan filed an amended motion for new trial on January 11, 2016. (ECF No. 17-22 at 96-97; 17-36 at 7.) Because Petitioner was transferred to the Texas Department of Correctional Justice—Correctional Institutions Division (TDCJ-CID) on January 14, 2016, Mr. Payan did not meet with him until February 17, 2016. (ECF No. 17-36 at 7.) The motion for new trial hearing was held on February 22, 2016 where Mr. Payan represented Petitioner. Thus, Mr. Payan had from January 11, 2016 (the date he filed in amended motion for new trial), to February 22, 2016, to prepare for the hearing.

"It is well-settled that a defendant's right to counsel attaches "at or after the time adversary judicial proceedings have been initiated against him, and once the right attaches, it continues to apply to every critical stage of the proceedings." *McAfee v. Thaler*, 630 F.3d 383, 391 (5th Cir. 2011) (citations omitted). The Fifth Circuit has held "there is a Sixth Amendment right to the

assistance of counsel at the motion for new trial, during the post-trial, pre-appeal period, in Texas." *Id*. at 393. Here, there was a two-week delay between the withdrawal of trial counsel and the appointment of appellate counsel. Petitioner points to no law suggesting such a delay implicates his Sixth Amendment rights, and the Supreme Court has expressly declined to decide a similar issue. *See Rothgery v. Gillespie Cnty., Tex*, 554 U.S. 191, 213 (2008) ("We do not decide wither the 6-month delay in appointment of counsel resulted in prejudice to Rothgery's Sixth Amendment rights, and have no occasion to consider what standards should apply in deciding this.") In the absence of any controlling precedent, the Court concludes the state habeas court's decision denying this claim was not objectively unreasonable.

Petitioner goes on to argue that the delay in appointing appellate counsel resulted in Mr. Payan being unprepared for the new trial hearing. At the beginning of the hearing, Mr. Payan objected to Texas Rule of Appellate Procedure Rule 21.8, arguing it seriously limited his preparation time while Petitioner was at TDCJ-CID, and made it difficult for him to represent Petitioner to the best of his abilities. (ECF No. 17-36 at 5-8.) However, Mr. Payan went on to conduct the hearing, and called several witnesses to testify, including Ms. Chagois, who did not testify at the trial. Most of Petitioner's arguments here mirror those he made in his IATC claims, i.e. that had counsel had more time to prepare, counsel could have located witnesses and obtained evidence to substantiate Petitioner's alibi that he did not live at Ms. Haney's house and could not have sexually abused the complainant. But, like the IATC claims, Petitioner points to no evidence outside his own statements to support his theories, and there is abundant evidence in the trial record supporting the conclusion that Petitioner did have opportunity to sexually abuse the complainant. *See Ross*, 694 at 1012 ("mere conclusory allegations do not raise a constitutional issue in a habeas

proceeding"). The Court thus concludes the state habeas court's decision was not an unreasonable application of federal law or an unreasonable application of the facts in light of the evidence presented, and this claim should be denied.

## C.  Prosecutorial Misconduct (claim 11)

In claim 11, Petitioner argues the prosecutor engaged in misconduct by soliciting perjured testimony from the complainant, Felicia Smith, Terrance Smith, and Amisca Mallard, and by making an improper closing argument when she referred to facts not in evidence and commented on the complainant's prior sexual experiences. Petitioner is not specific; however, Respondent speculates the facts not in evidence involved Ms. Haney's jailhouse phone call where she said she heard the complainant "moaning and the bed knocking against the wall" while Petitioner was in her room. Petitioner has not rebutted this assumption.

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that a criminal defendant is denied due process when the State knowingly uses false or perjured testimony or allows false testimony to go uncorrected at trial. *See also Giglio v. United States*, 405 U.S. 150 (1972). A petitioner seeking to obtain relief on such a claim must show that (1) the testimony is false, (2) the prosecution knew that the testimony was false, and (3) the testimony was material. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007); *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001). False testimony is only material if there was a reasonable likelihood that it affected the jury's verdict. *Giglio*, 405 U.S. at 153-54; *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

Here, Petitioner restates his allegations that complainant was coerced into making the outcry by Felicia Smith and that Felicia Smith, Terrance Smith, and Amisca Mallard all committed

perjury by falsely testifying at Petitioner's trial and sentencing, and that the prosecution knowingly used this false testimony to obtain a conviction. Petitioner has offered no evidence to substantiate his claim of perjury and, again, his conclusory opinion as to the complainant's and other witnesses' credibility and the veracity of their testimony does not establish that their testimony was false or that the prosecution knew the testimony was false. *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988) (inconsistencies in witnesses' testimony at trial are to be resolved by trier of fact and do not suffice to establish that certain testimony was perjured); *Ross*, 694 F.2d at 1012.

Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is required to plead facts in support of his claims. "'Absent evidence in the record,'" a court should not "'consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . , unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.'" *Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018) (quoting *Ross*, 694 F.2d at 1011). Because Petitioner offers no facts or evidence to support his allegation of perjury, his claim is conclusory and should be denied. *See Miller*, 200 F.3d at 282 (a petitioner is not entitled to relief on the basis of conclusory allegations).

As to the prosecutor's closing arguments, Petitioner must show that the prosecutor's improper arguments "so infected the penalty phase of the trial with unfairness as to make the resulting sentence a denial of due process." *Barrientes*, 221 F.3d at 753; see also *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The burden is on the petitioner to show "a reasonable probability 'that but for these remarks' the result would have been different." *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995) (citation omitted). The prosecutor's statements must render the trial fundamentally unfair. *Barrientes*, 221 F.3d at 744. "A trial is fundamentally unfair if 'there is

27

reasonable probability that the verdict might have been different had the trial been properly conducted." *Id.* (citing *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992).) "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden*, 477 U.S. at 181 (citation omitted).

Petitioner has not met his burden of showing that, but for the prosecutor's statements, it is reasonably probable that the result of his trial would have been different. Assuming he is arguing that the prosecutor improperly referred to the jailhouse telephone call between him and his mother, it is clear from the Court of Appeals opinion—which expressly refers to and quotes from this telephone call—that the phone call was in evidence and there can be no error in the prosecutor referring to it. Accordingly, Petitioner is not entitled to federal habeas relief on these grounds.

## D.  Ineffective Assistance of Appellate Counsel (IAAC) (claims 13-14)

Petitioner raises two IAAC claims in his federal petition. Petitioner first argues his appellate counsel provided ineffective assistance when he failed to investigate and find evidence to support the errors raised on appeal; and, in the alternative, that counsel should have moved to abate the appeal so the record could be further "fleshed out." Second, Petitioner argues appellate counsel provided ineffective assistance by failing to raise various meritorious claims on appeal, including prosecutorial misconduct, trial counsel's failure to object to prosecutorial misconduct, and "his own government cause ineffectiveness" stemming from counsel's appointment having been delayed two weeks after trial counsel withdrew.

A criminal defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under state law. *Evitts v. Lucey*, 469 U.S. 387 (1985); *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). The *Strickland* standard for proving ineffective

assistance of counsel applies equally to both trial and appellate attorneys. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013). Thus, to obtain relief on his IAAC grounds, Petitioner must demonstrate that (1) appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of Petitioner's appeal would have been different. *See Smith*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d 255, 260-61 (5th Cir. 2015). He does neither.

There is nothing in the record to support Petitioner's claim that his appellate counsel provided him with constitutionally deficient legal assistance. Appellate counsel raised three points of error on appeal: (1) the evidence was legally insufficient to support the verdict; (2) trial counsel provided ineffective assistance; and (3) the trial court erred in not granting the motion for new trial. (ECF No. 17-7.) To demonstrate deficiency, Petitioner must show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues"; however, counsel is not required to "raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Smith*, 528 U.S. at 286, 288.

The claims Petitioner brings against appellate counsel echo back to the claims he brought against trial counsel. The Court has already concluded the denial of Petitioner's IATC claims was not objectively unreasonable. The same holds for Petitioner's IAAC claims. Rather than pursuing an appeal, Petitioner apparently wanted his counsel to relitigate his criminal trial by further investigating in order to find documentary and exculpatory evidence. But this was not counsel's task. Counsel's performance cannot be deemed deficient for not engaging in activities that went beyond the scope of his appointment. Further, there is no error in counsel not pursuing every

29

conceivable error in the appeal, and as noted in prior sections, the errors Petitioner wanted counsel to raise are not nonfrivolous. Accordingly, the state habeas court was not objectively unreasonable in denying Petitioner's IAAC claims.

### E.  Plain Error in Denying Motion for New Trial (claim 15)

In claim 15, Petitioner argues he is entitled to federal habeas relief because the trial court erred in denying his motion for a new trial, and the Court of Appeals should not have decided his appeal based on an incomplete record.

It is not clear from the petition what federal or constitutional right Petitioner believes was violated when the trial court denied his motion for a new trial. As Respondent points out, "an error in the application of state law by the trial court does not provide grounds for federal habeas relief." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). If Petitioner's claim is based on a violation of state law, then federal habeas is not the forum in which to pursue it. If it is based on a violation of any of the federal and constitutional rights previously discussed, then it fails for the same reasons the other claims failed. Accordingly, the state habeas court's denial of this claim was not objectively unreasonable and should be denied.

### F.  Legally Insufficient Evidence (claim 16)

In claim 16, Petitioner argues he is entitled to federal habeas relief because the evidence presented at his criminal trial was legally insufficient to support his conviction. Specifically, Petitioner argues that "[o]nce the record in this matter is fully fleshed out, after I have had a full and fair hearing . . . no juror, acting reasonably, could find every element of the offense for which I was convicted beyond a reasonable doubt." Respondent argues that Petitioner failed to include this claim in his PDR and is thus procedurally barred from bringing it here.

30

Petitioner was convicted of one count of continuous sexual abuse of a young child. Under

Texas Penal Code § 21.02(b)-(c), the elements of this offense are as follows:

> (b) A person commits an offense if:
>> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and
>> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense.
> (c) For purposes of this section, "act of sexual abuse" means any act that is a violation of one or more of the following penal laws:
>> (2) indecency with a child under Section 21.11(a)(1), if the actor committed the offense in a manner other than by touching, including touching through clothing, the breast of a child;
>> (3) sexual assault under Section 22.011;
>> (4) aggravated sexual assault under Section 22.021.

Petitioner challenged the sufficiency of the evidence in his direct appeal (ECF No. 17-7)

but did not raise the issue in his PDR (ECF No. 17-19). He claimed insufficiency of the evidence

as a ground for relief in his state habeas application, which was then denied without written order.

Because Petitioner did not bring this claim in his PDR, Respondent argues he is procedurally

barred from bringing the claim in this forum based on a longstanding Texas procedural rule

prohibiting the TCCA from entertaining sufficiency of the evidence claims on habeas review. *See*

*West v. Johnson*, 92 F.3d 1385, 1398 n.18 (5th Cir. 1996) (TCCA has long held that sufficiency of

the evidence may only be raised on direct appeal and not on state habeas); *Ex parte McLain*, 869

S.W.2d 349, 350 (Tex. Crim. App. 1988) (en banc).

Even if Petitioner is not procedurally barred from challenging the sufficiency of the

evidence in his federal writ, there is no merit to the claim. The standard for testing the sufficiency

of evidence in a federal habeas review of a state court conviction is whether, after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Leahy*, 82 F.3d 624, 633 (5th Cir. 1996). In addition, the AEDPA imposes a "twice-deferential standard" when a federal court reviews a state prisoner's claim challenging the sufficiency of the evidence.

*Parker v. Matthews*, 567 U.S. 37, 43 (2012). As the Supreme Court explained:

> The opinion of the Court in *Jackson v. Virginia* . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (citations omitted). Upon independent review of the record, the Court concludes that the evidence adduced at trial supports the conviction: the complainant testified that Petitioner had indecently touched her and sexually assaulted her on several occasions, and her testimony was corroborated by an outcry witness, outside experts, and by Petitioner's own mother in the jailhouse phone call. Accordingly, the state habeas court's denial of this claim was not objectively unreasonable and this claim should be denied.

## G.  Trial Court and Court of Appeals Use of Incorrect Legal Standard (claim 19)

In Petitioner's final ground for relief, he argues that the trial court and Court of Appeals plainly erred by using the *Strickland* standard, rather than *Cronic*, when analyzing and denying his motion for a new trial. As Petitioner notes in his response to Respondent, this claim is not

cognizable on federal habeas review. *See Pemberton*, 991 F.2d at 1223 (federal habeas court asks only whether a constitutional violation infected the trial; an error in the application for state law does not provide grounds for federal habeas relief). Further, even if it were cognizable, it is meritless as explained in the preceding sections. Thus, the state habeas court's decision to deny this claim was not objectively unreasonable.

### H. Motion for Evidentiary Hearing, to Appoint Counsel, and for Bench Warrant

Section 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

As explained above, Petitioner has failed to plead any allegations that would entitle him to a hearing. Accordingly, Petitioner's motion for an evidentiary hearing should be denied. Further, because Petitioner's federal habeas writ is without merit, his motions for appointment of counsel, issuance of a bench warrant, issuance of subpoenas, and loan of appellate record should also be denied.

### IV. Recommendation

The undersigned recommends that the District Court **DENY** Petitioner's petition for a writ of habeas corpus and **DENY** Petitioner's pending motion.

## V. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the undersigned recommends that the Court should not issue a certificate of appealability.

## VI. Objections

Within 14 days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636 (b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained within this report within 14 days after service shall bar an aggrieved party from de novo review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

ENTERED this 21st day of July, 2020.

Andrew W. Austin
United States Magistrate Judge